UNITED STATES BANKRUPTCY COURT                    Not For Publication
SOUTHERN DISTRICT OF NEW YORK
_____
                                                 :
In re                                            :        Chapter 11
                                                 :
ENRON CORP., *et al.*,                           :        Case No. 01-16034 (AJG)
                                                 :            (Confirmed Case)
                Reorganized Debtors.             :
                                                 :
                                                 :
_____:
                                                 :
ENRON CORP.,                                     :
                                                 :
                Plaintiff,                       :
                                                 :
                v.                               :        Adv. Pro. No. 05-01074
                                                 :
BEAR, STEARNS & CO. INC. and                     :
RUSHMORE CAPITAL-I, L.L.C.,                       :
                                                 :
                Defendants.                       :
_____:


OPINION DENYING FIRST CAUSE OF ACTION OF MOTION TO DISMISS FILED
BY BEAR, STEARNS & CO. INC. REGARDING EQUITABLE SUBORDINATION

A P P E A R A N C E S :

SUSMAN GODFREY L.L.P.
Special Litigation Counsel to the Reorganized Debtors
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096

                H. Lee Godfrey, Esq.
                Kenneth S. Marks, Esq.
                Mary Kathryn Sammons, Esq.
                James T. Southwich, Esq.
                        Of Counsel

TOGUT, SEGAL & SEGAL LLP
Attorneys for the Reorganized Debtors
One Penn Plaza, Suite 3335
New York, NY  10119

Albert Togut, Esq.
Scott E. Ratner, Esq.
Richard K. Milin, Esq.
Of Counsel

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Attorneys for Bear, Stearns & Co. Inc.
1177 Avenue of the Americas
New York, NY  10036

Stephen M. Sinaiko, Esq.
Jonathan A. Popolow, Esq.
Of Counsel

ALLEN & OVERY LLP
Attorneys for Barclays Bank PLC, and its Affiliates
1221 Avenue of the Americas
New York, NY  10020

Hugh McDonald, Esq.
Of Counsel

SULLIVAN & CROMWELL LLP
Attorneys for Barclays Bank PLC, and its Affiliates
125 Broad Street
New York, NY  10004

David H. Braff, Esq.
Michael T. Tomaino, Jr., Esq.
Jeffrey T. Scott, Esq.
Of Counsel

CRAVATH, SWAINE & MOORE LLP
Attorneys for Credit Suisse First Boston LLC, and its Affiliates
Worldwide Plaza
825 Eighth Avenue
New York, NY  10019-7475

Richard W. Clary, Esq.
Julie A. North, Esq.
Darin P. McAtee, Esq.
Of Counsel

MAYER, BROWN, ROWE & MAW LLP
Attorneys for Canadian Imperial Bank of Commerce, CIBC Capital Corporation,

CIBC World Markets Corp., CIBC Capital Corporation,
CIBC World Markets plc, and CIBC, Inc.
1675 Broadway
New York, NY  10019-5820

Robert J. Ward, Esq.
Andrew D. Shaffer, Esq.
Of Counsel

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Attorneys for Citibank, N.A.
1285 Avenue of the Americas
New York, NY  10019-6064

Stephen J. Shimshak, Esq.
Douglas R. Davis, Esq.
Of Counsel

SHEARMAN & STERLING LLP
Attorneys for Merrill Lynch & Co. Inc., Merrill Lynch, Pierce, Fenner & Smith, Inc.,
and Merrill Lynch Capital Services, Inc.
599 Lexington Avenue
New York, NY  10022-6069

Herbert Washer, Esq.
William J.F. Roll III, Esq.
Kristin Fitzmaurice, Esq.
Of Counsel

SEWARD & KISSEL LLP
Attorneys for Royal Bank of Canada, *et al.,*
One Battery Park Plaza
New York, NY  10004

Michael J. McNamara, Esq.
John R. Ashmead, Esq.
Mark D. Kotwick, Esq.
Of Counsel

SEWARD & KISSEL LLP
Attorneys for The Bank of New York, as Indenture Trustee
and Collateral Agent, and Yosemite/CLN Trust
One Battery Park Plaza
New York, NY  10004

Ronald L. Cohen, Esq.

3

John J. Galban, Esq.
Of Counsel

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Attorneys for The Bank of New York, as Indenture Trustee
and Collateral Agent, and Yosemite/CLN Trust
1633 Broadway
New York, NY  10019

David M. Friedman, Esq.
Richard F. Casher, Esq.
Robert M. Novick, Esq.
Daniel N. Zinman, Esq.
Of Counsel

McGUIREWOODS LLP
Attorneys for The Toronto-Dominion Bank
1345 Avenue of the Americas
Seventh Floor
New York, NY  10105-0106

John H. Maddock, III, Esq.
Of Counsel

Washington Square
1050 Connecticut Avenue, N.W.
Suite 1200
Washington, DC  20036-5317

Robert Plotkin, Esq.
Dion W. Hayes, Esq.
Of Counsel

ARTHUR J. GONZALEZ
United States Bankruptcy Judge

The matter before the Court concerns a claim asserted against a bankruptcy estate

that arose out of the letter of credit and reimbursement agreement.  The bank that was the

original holder of the letter-of-credit claim in issue transferred the claim to a third party.

The transferring bank allegedly engaged in certain inequitable conduct, unrelated to the

letter-of-credit claim, which is currently the subject of a separate adversary proceeding

commenced against several banks. The issue presented is whether the letter-of-credit claim, which was transferred by the original holder who is alleged to have engaged in certain inequitable conduct regarding other claims, would be subject to subordination under section 510(c) of the Bankruptcy Code in the hands of a transferee.[1]

The Court has bifurcated the issue. The first inquiry is whether section 510(c) of the Bankruptcy Code grants a court authority to subordinate a claim that did not arise from any misconduct, but was held by a creditor who is found to have engaged in inequitable conduct against the debtor. The second inquiry is to what extent, if any, a claim subject to equitable subordination in the hands of a transferor remains subject to equitable subordination in the hands of a transferee.

With respect to the first inquiry, the Court concludes that equitable subordination is not limited to only those claims related to the inequitable conduct that caused the injury to the creditor class. Rather, equitable subordination can apply to any claim unrelated to any inequitable conduct held by the claimant alleged to have engaged in that conduct, limited by the amount of damages stemming from the inequitable conduct that is not otherwise compensated to that class.

With respect to the second inquiry, the Court concludes that the transfer of a claim subject to equitable subordination does not free such claim from subordination in the hands of a transferee. Rather, a claim in the hands of a transferee, either as an initial transferee or a subsequent transferee, who received that claim from a transferor found to have engaged in inequitable conduct is subject to the same equitable relief, as if, such claim was still held by the transferor. The remedy of equitable subordination remains

---

[1] For purposes of this Opinion, "transferee," unless specifically defined otherwise, refers to any initial transferee or any immediate or mediate transferee, including subsequent transferees of an immediate transferee.

with the claim. Therefore, a claim in the hands of a transferee is not immunized from subordination even though such transferee may have paid value for such claim and not have engaged in any conduct that would otherwise subject the transferee to the remedy of equitable subordination.

The Court also concludes that the remedy of subordinating claims in the hands of a transferee, not found to have engaged in inequitable conduct, does not contradict the purpose of section 510(c) of the Bankruptcy Code or any provision therein. Rather, it ensures that the purpose of the statute is fulfilled because a creditor, who is found to have engaged in inequitable conduct and harmed its creditor class, would not be permitted to frustrate, hinder, dilute or in any way delay distribution to the other members of the injured creditor class by means of transferring its claims.

Lastly, the Court concludes that the policy underlying the "good faith" defense in various provisions of the Bankruptcy Code does not warrant the extension of such defense to a claim-purchaser. Further, the Court finds that a transferee purchasing a post-petition claim cannot avail itself of the "good faith" defense because such transferee is not a purchaser who took without knowledge of potential actions that could be brought against the purchased claim. Rather, by purchasing a claim in a bankruptcy proceeding, the transferee knows or should know that such claim would be subject to review and investigation. The possibility of the commencement of an action by a trustee or a debtor in possession, who is obligated to prosecute actions in furtherance of the interests of the estate, including equitable subordination, is one of the assumed risks attendant to the purchase of a claim. The possibility of such action is not mere speculation as may be the case regarding a "good faith" purchaser who by definition purchases without knowledge

6

that an investigation of property at issue would be undertaken. Rather, the claim-purchaser does so with the knowledge that the estate's fiduciary *must* examine each claim to determine whether an action, including one based upon equitable subordination, is warranted. Further, there is no dispute that such risks are routinely protected against in transfer documents. Whether the claim-purchaser protects itself is not an issue with which the Court need be involved.

Enron's cause of action based on equitable subordination is sufficient to withstand a motion to dismiss. Therefore, motion to dismiss filed by Bear, Stearns & Co. Inc. ("Bear") based upon the alleged inapplicability of section 510(c) of the Bankruptcy Code to the letter-of-credit claim in the hands of a transferee is denied.

## FACTS

Commencing on December 2, 2001 (the "Petition Date"), and from time to time continuing thereafter, Enron Corporation ("Enron") and certain of its affiliated entities, (collectively, the "Debtors"), filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On July 15, 2004, the Court entered an Order confirming the Debtors' Supplemental Modified Fifth Amended Joint Plan of Affiliated Debtors (the "Plan") in these cases. The Plan became effective on November 17, 2004.

As borrower, Enron entered into a $1,750,000,000 364-day Revolving Credit Agreement (the "Short-Term Credit Agreement"), dated May 14, 2001, with certain participating banks (the "Banks"), among them, Citibank, N.A. ("Citibank") as paying agent, and Citibank and Chase Manhattan Bank ("Chase") as co-administrative agents.

Prior to the Petition Date, Enron was an obligor under a $500,000,000 Letter of Credit and Reimbursement Agreement (the "LC Agreement") dated as of May 14, 2001. Citibank and Chase acted as co-administrative agents, and Chase acted as paying agent and as issuing bank.

On October 9, 2002, the Court authorized Chase to file consolidated proofs of claim (Claim Nos.11166, 11233-36, 22135-38) in its capacity as administrative agent on behalf of certain creditors under the LC Agreement. On October 15, 2002, the Court authorized Citibank to file a proof of claim (Claim No. 14196) in its capacity as paying agent on behalf of certain creditors under the Short-Term Credit Agreement. Citibank sought a consolidated secured claim in the amount of $1,754,024,000, plus unliquidated amounts for the principal and unpaid interest under the Short-Term Credit Agreement.

On or about May 23, 2003, Rushmore Capital-I, L.L.C. ("Rushmore") received a claim in the amount of approximately $10,000,000.00 under the Short-Term Credit Agreement from Credit Suisse First Boston ("CSFB"). On or about May 26, 2004, Bear purchased a $15,500,000 claim in outstanding principal amount of obligations under the LC Agreement (the "Claim"). As of the Petition Date, CSFB was the holder of the claims under the LC Agreement and the Short-Term Credit Agreement asserted against Enron's estate. The claims were transferred to Rushmore and Bear (collectively, the "Defendants").

On September 23, 2003, Enron commenced an adversary proceeding (the "Megacomplaint Proceeding," Docket No. 03-09266) against the Banks. On December 1, 2003, April 30, 2004, June 14, 2004 and January 10, 2005, Enron filed the first, second, third and fourth amended complaints in the Megacomplaint Proceeding,

respectively.  In the Megacomplaint Proceeding, Enron alleges that CSFB engaged in and

benefited from inequitable conduct that resulted in injury to Enron's creditors and

conferred an unfair advantage on CSFB.  Moreover, in the Megacomplaint Proceeding or

in this adversary proceeding, Enron does not allege that there was any fraudulent or

unlawful conduct under the LC Agreement and the Short-Term Credit Agreement.

On January 19, 2005, Enron commenced this adversary proceeding, seeking to

subordinate and disallow the claims held by CSFB in the Megacomplaint Proceeding as

of the Petition Date against the Debtors' estate, and subsequently transferred to and

asserted by the Defendants.  In the complaint filed in this adversary proceeding (the

"Complaint"), Enron seeks relief based on two causes of action.  The first is based on the

principles of equitable subordination.  The second is based on the disallowance of claims

or interests under section 502(d) of the Bankruptcy Code.  The second cause of action is

not addressed by this Opinion.

With respect to the first cause of action, Enron asserts that under section 510(c) of

the Bankruptcy Code, the claims would have been subordinated for purposes of

distribution, and any liens securing the claims would have been transferred to Enron's

estate, had the claims not been transferred from CSFB to the Defendants.  Enron contends

that the claims should be subordinated to the same extent as if CSFB had continued to

hold the claims, and any liens securing the claims should be transferred to Enron's estate.

On May 20, 2005, Bear[2] filed a motion to dismiss the adversary proceeding,

pursuant to Federal Rule of Bankruptcy Procedure ("Fed. R. Bankr. P.")  7012(b) and

---

[2] Rushmore answered the Complaint on April 1, 2005.  In its answer, Rushmore stated that Enron's
Complaint should be dismissed based on its failure to state a claim upon which relief may be granted.
However, the Court's review of the docket of this adversary proceeding reveals that Rushmore did not

Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(b)(6), for failure to state a claim.

Bear contends that the sole basis of the cause of action asserted by Enron against Bear is

that CSFB allegedly received preferences or fraudulent conveyances from Enron, or

engaged in inequitable acts that are unrelated to the Claim stemming from the LC

Agreement.  No allegation is made in the Complaint that Bear engaged in improper or

unlawful conduct, or received any preferences or fraudulent conveyances.  Further, no

allegation is made that the LC Agreement were part of any fraudulent conduct.  Thus,

Bear concludes that the Claim should not be subject to subordination because, pursuant to

section 510(c) of the Bankruptcy Code, the party whose claims are subordinated must

have engaged in inequitable conduct causing injury to the creditors or the estate.

Pursuant to section 1109(b) of the Bankruptcy Code and the Court's Coordinated

Scheduling and Intervention Order (the "Scheduling Order"), dated April 27, 2005,

Barclays Bank PLC, Canadian Imperial Bank of Commerce, Citibank, N.A., CSFB,

Merrill Lynch & Co., Inc., Royal Bank of Canada and The Toronto-Dominion Bank

submitted a memorandum of law, dated July 15, 2005, in support of Bear's motion to

dismiss the adversary proceeding.  Additionally, pursuant to the Scheduling Order, The

Bank of New York as Indenture Trustee and Collateral Agent for Yosemite Securities

Trust I and Yosemite Securities Company, Ltd., together with Enron Credit Linked Notes

---

move or join with Bear to dismiss Enron's Complaint by the motion before the Court.  Therefore,
Rushmore is not a moving defendant in the motion.

 Additionally, because Bear adopts and incorporates the arguments set forth by OCM Administrative
Services II, LLC in its Memorandum of Law In Support of Its Motion to Dismiss in the Complaint in
*Enron Corp., et ano .v. OCM Administrative Services II, LLC*, Adv. Pro. No. 05-01023 (AJG) (Bankr.
S.D.N.Y.), and by certain banks in the Megacomplaint Proceeding, Bear's counsel requested the Court
waive the requirement contained in Rule 9013(b) of the Local Bankruptcy Rules for the Southern District
of New York that a separate memorandum of law be submitted.

Trusts submitted a memorandum of law in support of Bear's motion to dismiss filed in the Coordinated Actions.[3]

A hearing on this matter was held before the Court on August 9, 2005.

## DISCUSSION[4]

Fed. R. Civ. P. 12(b)(6) is incorporated into bankruptcy procedure by Fed. R. Bankr. P. 7012(b).  In considering a Fed. R. Civ. P. 12(b)(6) motion to dismiss for failure to state a claim for relief, a court accepts as true all material facts alleged in the complaint and draws all reasonable inferences in favor of the plaintiff.  *Walker v. City of New York*, 974 F.2d 293, 298 (2d Cir. 1992).  A motion to dismiss is granted only if no set of facts can be established to entitle the plaintiff to relief.  *Id*.

In considering such a motion, although a court accepts all the factual allegations in the complaint as true, the court is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Papasan v. Allain*, 478 U.S. 265, 286 (1986).  Thus, where more specific allegations of the complaint contradict such legal conclusions, "[g]eneral, conclusory allegations need not be credited."  *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995).  Rather, to withstand a motion to dismiss, there must be specific and detailed factual allegations to support the claim.  *Friedl v. City of New York*, 210 F.3d 79, 85-86 (2d Cir. 2000).

---

[3] Under the Scheduling Order, the term "Coordinated Actions" is defined to include certain adversary proceedings regarding financial institutions and their transferees, including Bear.  By that order the adversary proceedings are coordinated before the Court for the purposes of adjudicating the issues raised in any motion to dismiss, motion on the pleadings, motion for summary judgment or for partial summary judgment in connection therewith.

[4] The Court issues this Opinion based on the same analysis as in the Opinion regarding equitable subordination of claims originally held by Fleet National Bank, dated as November 17, 2005, in which DK Acquisition Partners, LP, RCG Carpathia Master Fund, Ltd., Rushmore Capital-I, L.L.C., and Rushmore Capital-II, L.L.C raised the identical claims and defenses in their motion to dismiss concerning equitable subordination of the transferred claims, unrelated to inequitable conduct, in the hands of the transferees.

"Although bald assertions and conclusions of law are insufficient, the pleading standard is nonetheless a liberal one." *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998). Pursuant to Fed. R. Civ. P. 8(a), which is made applicable to adversary proceedings by Fed. R. Bankr. P. 7008, in asserting a claim, the pleader need only set forth a short and plain statement of the claim showing that the pleader is entitled to relief. The purpose of the statement is to provide "fair notice" of the claim and "the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The simplicity required by the rule recognizes the ample opportunity afforded for discovery and other pre-trial procedures, which permit the parties to obtain more detail as to the basis of the claim and as to the disputed facts and issues. *Id*. at 47-48. Based upon the liberal pleading standard established by Fed. R. Civ. P. 8(a), even the failure to cite a statute, or to cite the correct statute, will not affect the merits of the claim. *Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 46 (2d Cir. 1997).

In reviewing a Fed. R. Civ. P. 12(b)(6) motion, a court may consider the allegations in the complaint; exhibits attached to the complaint or incorporated therein by reference; matters of which judicial notice may be taken; *Brass v. Am. Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); and documents of which plaintiff has notice and on which it relied in bringing its claim or that are integral to its claim. *Cortec Indus. Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 48 (2d Cir. 1991). However, mere notice or possession of the document is not sufficient. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). Rather, a necessary prerequisite for a court's consideration of the document is that a plaintiff relied "on the terms and effect of a document in drafting the complaint." *Id*. As such, the document relied upon in framing

the complaint is considered to be merged into the pleading.  *Id.* at 153 n.3 (citation

omitted).  In contrast, when assessing the sufficiency of the complaint, the court does not

consider extraneous material because considering such would run counter to the liberal

pleading standard which requires only a short and plain statement of the claim showing

entitlement to relief.  *See* Fed. R. Cir. P. 8(a), *Chambers,* 282 F.3d at 154.  Nevertheless,

in considering a Fed. R. Civ. P. 12(b)(6) motion, a court may consider facts as to which

the court may properly take judicial notice under Rule 201 of the Federal Rules of

Evidence ("Fed. R. Evid.").  *In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351, 383

n.3 (S.D.N.Y. 2003) (citing, *Chambers,* 282 F.3d at 153).

To survive a motion to dismiss, a plaintiff only has to allege sufficient facts, not

prove them.  *Koppel v. 4987 Corp.*, 167 F.3d 125, 133 (2d Cir. 1999).  A court's role in

ruling on a motion to dismiss is to evaluate the legal feasibility of the complaint, not to

undertake to weigh the evidence, which may be offered to support it.  *Cooper*, 140 F.3d

at 440 (citations omitted).

Thus, for the purposes of the Motion to Dismiss, the Court accepts as true all of

the material allegations in the Plaintiff's complaint.  Further, for purposes of this motion,

Bear does not dispute any of the factual allegations regarding CSFB.  The focus of Bear's

motion is that, even if such allegations were true, the cause of action for equitable

subordination fails as a matter of law.

*Parties' Contentions*

Enron argues that the Claim should be subject to subordination on the ground that

the equitable doctrine under section 510(c) of the Bankruptcy Code warrants the

subordination of the Claim and that the Claim that would have been subject to

13

subordination as of the Petition Date should remain subject to subordination thereafter.

Enron further argues that the purchasers of the Claim should have protected themselves

by demanding indemnities rather than by seeking to limit a debtor's rights.  In addition,

Enron contends that a judicial holding that the Claim cannot be subordinated based on the

transferor's conduct would render section 510(c) of the Bankruptcy nugatory.  Enron

argues that the consequence of such a holding would encourage wrongdoers to "wash"

their claims in order to escape from subordination.  Enron argues that, as a result, such a

holding would be contrary to public policy and congressional intent under the Bankruptcy

Code.  Finally, Enron argues that the good faith of the transferee is irrelevant because the

focus here is on the conduct of the original holder of the Claim under section 510(c) of

the Bankruptcy Code.

Pursuant to Fed. R. Civ. P. 12(b)(6), incorporated into bankruptcy procedure by

Fed. R. Bankr. P. 7012(b), Bear moves to dismiss the Complaint as a matter of law based

upon its contention that equitable subordination applies to a creditor who is found to have

participated in inequitable conduct, not to the particular claim at issue.  Specifically, Bear

argues that, under the plain language of section 510(c) of the Bankruptcy Code,

subordination does not follow the claim, but serves to punish claimants who are found to

have acted inequitably.  Bear asserts that the conduct of one party is not imputed to

another for purposes of equitable subordination.

Further, in response to Enron's argument that the good faith of a transferee lacks

merit, Bear cites section 550(b) of the Bankruptcy Code, which provides that when the

initial transferee of a debtor's property transfers such property to a third party, a trustee

may not recover the debtor's property from that subsequent transferee if the subsequent

transferee purchased the property in good faith.  Bear asserts that Congress did not intend to punish a good faith purchaser.  In addition, Bear asserts that as a matter of public policy under the Bankruptcy Code, equitable subordination is not warranted where a good faith and innocent purchaser acquired a claim for fair value without knowledge of the alleged wrongful conduct by the seller or the transferor.

Bear also asserts that the inclusion of indemnity provisions in privately negotiated contracts does not imply that section 510(c) of the Bankruptcy Code should apply, nor does it imply that Congress intended to require private parties to negotiate indemnities. In addition, Bear directs the Court's attention to the fact that, in the instant case, Enron has sought a remedy against CSFB in the Megacomplaint Proceeding.  Bear maintains that CSFB is a solvent financial institution that will be bound by any judgment requiring it to return allegedly avoidable or preferential transfers and to correct the wrongdoing by having its claims, related to inequitable conduct, subordinated.  As a result, Bear contends that the Claim should not be subject to equitable subordination.  In any event, Bear argues that Congress did not set up a statutory regime, which allows it to be sued.

As a matter of public policy, Bear argues that a judicial holding that a good faith transferee can be subject to equitable subordination solely on the basis of the transferor's conduct and long after the initial bankruptcy petition was filed would both introduce multiple layers of litigations against subsequent innocent transferees, and seriously and needlessly impact liquidity in the market for post-petition transfers of claims.  Further, Bear argues that such a holding would contradict congressional intent to exempt good faith transferees, as evidenced by section 550(b) of the Bankruptcy Code.

In opposition to Bear's motion to dismiss, Enron asserts that Bear's arguments lack merit. Enron asserts that its position is based on equitable principles. Further, Enron asserts that the innocence of a purchaser of a post-petition claim is not relevant to a determination of whether a claim is subject to subordination. Rather, Enron contends that the focus is on the seller's misconduct based on the analysis of the equitable doctrine. According to Enron, under the equitable doctrine, if misconduct by the holder of the Claim as of the Petition Date (i.e., CSFB) is established, that is sufficient to justify subordination. Enron maintains that a contrary ruling would encourage "claim washing" by allowing wrongdoers to profit at the expense of the estate creditors who are unprotected.

*Equitable Subordination*

The issue is whether the Claim transferred by the original holder, CSFB, to Bear, is immunized from equitable subordination under section 510(c) of the Bankruptcy Code. As stated previously, in order to make that determination, the Court bifurcates the issue. The first inquiry is whether section 510(c) of the Bankruptcy Code grants a court authority to subordinate a claim that did not arise from any misconduct, but was held by a creditor who is found to have engaged in inequitable conduct against the debtor. The second inquiry is to what extent, if any, a claim subject to equitable subordination in the hands of a transferor remains subject to equitable subordination in the hands of a transferee. In addition, the Court will determine whether Bear can assert by analogy the "good faith" defense under section 550(b) of the Bankruptcy Code to immunize the Claim from subordination.

16

Section 510(c)(1) of the Bankruptcy Code provides that, after notice and a

hearing, the court may -

> under principles of equitable subordination, subordinate for
> purposes of distribution all or part of an allowed claim to all or part
> of another allowed claim or all or part of an allowed interest to all
> or part of another allowed interest . . .

11 U.S.C. § 510(c)(1).

It has been well established that a bankruptcy court can subordinate an allowed

claim based on the equitable doctrine and the application of that doctrine is left to the

discretion of the court.  The equitable doctrine is applied where conduct is alleged

whereby a creditor injured other claimants and obtained unfair advantage over such

claimants.

Section 510(c) of the Bankruptcy Code "adopts the long-standing judicially

developed doctrine of equitable subordination under which a bankruptcy court has power

to subordinate claims against the debtor's estate to claims it finds ethically superior under

the circumstances."  *Allied E. States Maint. Corp., et al. v. Miller* (*In re Lemco Gypsum,*

*Inc.),* 911 F.2d 1553, 1556 (11th Cir. 1990) (citations omitted).  A bankruptcy court can

exercise its power when the following three elements are satisfied

> (1) the claimant must have engaged in some type of inequitable conduct,
> (2) the misconduct must have resulted in injury to the creditors or conferred an unfair
>     advantage on the claimant, and
> (3) equitable subordination of the claim must not be inconsistent with the provisions
>     of the Bankruptcy Act.

*Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 700 (5th Cir. 1977)

(citations omitted).

Courts have broad discretion in applying subordination based upon inequitable

conduct.  The *Mobile Steel* court concluded that the inequitable conduct need not be

17

related to the acquisition or assertion of the claim. *Id*. "Improper acts unconnected with
the acquisition or assertion of a particular claim have frequently formed at least a part of
the basis for the subordination of that claim." *Id.* at 700-01 (citation omitted). However,
a bankruptcy court can subordinate a claim only to the extent necessary to offset the harm
suffered by the bankrupt and its creditors on account of that conduct. *Id.* at 701. The
three-prong test set forth in *Mobile Steel*, a proceeding under Chapter XI of the
Bankruptcy Act, 11 U.S.C. §§ 701 *et seq.* (1970), has been used in the context of
applying the equitable subordination doctrine under the Bankruptcy Code. The Court
finds that the *Mobile Steel* test is the applicable standard under the Bankruptcy Code and
has applied this test in determining equitable subordination. *See Official Comm. of
Unsecured Creditors v. Morgan Stanley & Co., Inc., et al. (In re Sunbeam Corp.),* 284
B.R. 355, 363 (Bankr. S.D.N.Y. 2002).

In addition, "bankruptcy courts are empowered [by the common law concept of
the equitable doctrine] to subordinate claims where the subordination will promote a just
and equitable distribution of the bankruptcy estate." *Trone v. Smith* (*In re Westgate-
California Corp.),* 642 F.2d 1174, 1177 (9th Cir. 1981) (citation omitted).

The language of section 510(c) of the Bankruptcy Code affords a court's
discretion when it considers subordination of claims based on the common law concept
of the equitable doctrine. The Supreme Court has held that a bankruptcy court, pursuant
to its equitable power, always has the authority to subordinate an allowed claim in order
to assure "that fraud will not prevail, that substance will not give way to form, that
technical consideration will not prevent substantial justice from being done." *Pepper v.
Litton*, 308 U.S. 295, 305 (1939). In *Pepper v. Litton,* the Supreme Court noted that the

basis for the rule of equitable subordination is that "the bankruptcy court has the [equitable] power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate.'' *Id.* at 308 (citations omitted).  The purpose of section 510(c) of the Bankruptcy Code is to correct inequitable conduct and ensure no creditor gain an unfair advantage in the distribution of the estate.

Based on these principles set forth by the Supreme Court, it is within the court's discretion to determine whether claims can be subject to equitable subordination.  The Fifth Circuit held that "a bankruptcy court is entitled . . . to determine how and what claims are allowable for bankruptcy purposes, in order to accomplish the statutory purpose of advancing a ratable distribution of assets among the creditors." *Addison v. Langston* (*In re Brints Cotton Mktg, Inc.),* 737 F.2d 1338, 1341 (5th Cir. 1984) (citations omitted).  The Supreme Court affirmed that the purpose of the Bankruptcy Act is "to provide for the conservation of the estates of insolvents to the end that there may be as equitable a distribution of assets as is consistent with the type of claims involved." *Simonson v. Granquist*, 369 U.S. 38, 40 (1962).

When applying the equitable doctrine, a court will consider other factors, including administrative convenience and the delay of a bankruptcy proceeding.  Case law also directs a court to consider the grounds of "historical considerations of equity and administrative convenience," as well as "the broad equitable principle that creditors should not be disadvantaged vis-à-vis one another by legal delays attributable solely to the time-consuming procedures inherent in the administration of the bankruptcy laws." *Brints Cotton Mktg,* 737 F.2d at 1341 (citations omitted).  Courts are required to consider administrative convenience and the fundamental principles of equity that creditors of a

bankruptcy estate should not be disadvantaged because of the law's delay.  *Nicholas,* 384
U.S. at 689.

While a bankruptcy court can apply the equitable doctrine at its discretion,
nevertheless, the power to subordinate an allowed claim is not boundless and courts
cannot use equitable principles to disregard unambiguous statutory language of the
Bankruptcy Code.  The Supreme Court in *United States v. Noland* held that ". . . [t]he
circumstances that prompt a court to order equitable subordination must not occur at the
level of policy choice at which Congress itself operated in drafting the Code."  517 U.S.
535, 543 (1996) (citing *Stebbins v. Crocker Citizens Nat'l Bank* (*In re Ahlswede*), 516 F.
2d 784, 787 (9th Cir. 1975), which noted that "the [equity] chancellor never did, and does
not now, exercise unrestricted power to contradict statutory or common law when he
feels a fairer result may be obtained by application of a different rule")).  The Supreme
Court held that "[w]hatever equitable powers remain in the bankruptcy courts must and
can only be exercised within the confines of the Bankruptcy Code."  *Norwest Bank
Worthington, et al. v. Ahlers*, 485 U.S. 197, 206-07 (1988).  The application of the
*Mobile Steel* test ensures that the full breath of the remedy of equitable subordination is
available while ensuring that its reach does not violate any provision of the Bankruptcy
Code or become punitive as opposed to remedial.

Therefore, if the *Mobile Steel* test is established, the equitable doctrine provides
broad legal and policy grounds to subordinate claims to ensure that a debtor's estate can
receive the full breath of the remedy of equitable subordination that arises from the
misconduct.  Accordingly, equitable subordination is warranted if its absence would
frustrate the statutory purpose of advancing equitable distribution among creditors.

I.      *Equitable Subordination of Claims Unrelated to Inequitable Conduct*

The first inquiry is whether section 510(c) of the Bankruptcy Code grants a court authority to subordinate a claim that did not arise from any misconduct, but was held by a creditor who is found to have engaged in inequitable conduct against the debtor.

The proposition that a bankruptcy court can subordinate any claim held by a creditor found to have engaged in inequitable conduct to achieve a "just" result for the debtor's estate is consistent with the second prong of the *Mobile Steel* test*, in which a claim can be subordinated to the extent necessary to offset the harm arising from the inequitable conduct to the bankrupt's estate or its creditors. *Mobile Steel,* 563 F.2d at 701. The *Mobile Steel* court found that when a court considers equitable subordination of a claim, the inequitable conduct does not have to be related to such claim to justify the subordination. *Id.* at 706.[5]  In setting forth the first-prong of the *Mobile Steel* test, that court stated that "[i]mproper acts unconnected with the acquisition or assertion of a particular claim have frequently formed at least a part of the basis for the subordination of that claim." *Id.* at 700-01 (citation omitted).  It found "no case in which a federal court refused to subordinate a claim solely because, although inequitable conduct of sufficient magnitude to warrant subordination existed, the conduct was unrelated to the acquisition or assertion of the particular claim whose status was at issue." *Id.*  The Court has not found any case thereafter that would alter that proposition.  Instead, the Court finds that case law supports that proposition in *Wilson v. Huffman*, 818 F.2d 1135, 1146 (5th Cir.

---

[5] The Court has not found any support for the proposition that under section 510(c), the claim that is subordinated *must* directly or indirectly arise from inequitable conduct.  Thus, it follows that even if none of the claims held by that claimant are directly or indirectly related to the inequitable conduct attributable to the claimant, the unrelated claims may still be subordinated.  Fundamentally, the analysis focuses on the alleged inequitable conduct, and any associated harm therefrom, not on any particular claim or group of claims.

1987) (noting that "[a claimant's claim] could be subordinated on the basis of [the inequitable] conduct [by another person with whom such claimant had a partnership relationship], notwithstanding the court's finding that [such claimant] himself committed no overt acts of misconduct").

Additionally, in *Westgate-California*, the bankruptcy court initially ordered subordination of all of the claims held by the claimant, including claims unrelated to inequitable conduct.[6]  On subsequent motion, however, the bankruptcy court modified the order to subordinate only the claims involving inequitable conduct.  *Westgate-California*, 642 F.2d at 1176.  On appeal, the district court ordered the subordination of all claims held by the defendant, not limited to the claims involving misconduct.  *Id*.  The Ninth Circuit reversed, finding that because the harm by the defendant could be remedied by subordinating claims related to inequitable conduct, the subordination of all of the defendant's claims was punitive.  *Id*. at 1174-79.  Thus, the Ninth Circuit remanded the case to the district court to reconsider its order.  *Id*. at 1179.[7]

Significantly, the Ninth Circuit did not find, or even suggest, that section 510(c) of the Bankruptcy Code restrains courts from subordinating claims unrelated to the misconduct at issue.  The *Westgate-California* court reasoned "a claim will not be subordinated unless it is shown that the claimant has acted inequitably *in the course of his relationship with the debtor* and that those actions have harmed the debtor or his other

---

[6] In *Westgate-California*, the claimant had two categories of the claims in dispute – claims for money for decoration services and claims for furniture.  *Westgate-California*, 642 F.2d at 1175.  Only claims for furniture involved the inequitable conduct, including fraud, conversion, breach of fiduciary duty and falsification of records.  *Id*. at 1176-77.
[7] A dissenting judge found that the subordination of all of the defendant's claims was warranted because "This was not a single act of inequitable conduct but it is wrongdoing so pervasive and so damaging to the bankrupt that no court governed by equitable principles should permit the defendant to share in the assets of a bankrupt corporation on a parity with other creditors and stockholders."  *Id*. at 1179.

creditors in some way." *Id*. at 1178 (citations omitted) (emphasis added). Thus, that court at first found that the claimant had committed inequitable acts in the course of the claimant's relationship with the bankrupt, and then determined "whether those acts justify subordination of all of [such claimant's] claims." *Id.* at 1177.

In determining that issue, the *Westgate-California* court focused on the extent of the otherwise uncompensated injury from the inequitable conduct, and did not discuss or infer that there should be any other limitation on the application of the remedy. It found that "[b]ankruptcy courts are empowered to subordinate claims where subordination will promote a just and equitable distribution of the bankruptcy estate." *Id.* at 1177 (citation omitted). It recognized that "subordination is a means of regulating distribution results in bankruptcy by adjusting the order of creditors' payments to the equitable levels of their comparative claim positions . . . ." *Id.* (citation omitted). It further recognized that [subordination's] "fundamental aim is to undo or to offset any inequity in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results." *Id.* at 1177 (citations omitted). Limiting subordination only to those claims related to the inequitable conduct would unnecessarily deprive the aggrieved creditors of the full benefit of the remedy of equitable subordination, when the uncompensated injury caused by such claimant exceeds the amount of those claims. Such limitation would frustrate the court's ability to ensure a just and fair distribution of the bankruptcy estate.

The limitation for subordination of a claimant's claims is simply that ". . . the court ought not to subordinate where the value of the claim greatly exceeds the amount of damage that the claimant has inflicted by his inequitable conduct." *Id.* at 1178 (citation

omitted).  The *Westgate-California* holding set the boundary for the remedy of equitable

subordination by stating that "[b]ankruptcy courts must take care not to subordinate

claims where doing so will operate only to penalize the claimant."  *Id.*  That court

recognized that

> . . . [the power of subordination] should not operate to take away anything
> punitively to which one creditor is justly entitled in view of the liquidation
> finality, and bestow it upon others, who in the relative situation have no
> fair right to it. It can therefore ordinarily go no farther than to level off
> actual inequitable disparities on the bankruptcy terrain for which a creditor
> is responsible, to the point where they will not create unjust disadvantages
> in claim positions and liquidation results.

*Id.* (citations omitted).  It did not limit the remedy only to the claims related to

inequitable conduct, but, as previously stated, set the boundary as the amount of

otherwise uncompensated damages resulting from the inequitable conduct.  The line

between the remedy of equitable subordination and the imposition of a penalty is only

crossed where the amount that is subordinated is greater than the otherwise

uncompensated injury suffered by the other members of the injured creditor class.

Further, the court in *Mobile Steel* illustrated the extent to which subordination is

proper in noting that where "a claimant guilty of misconduct *asserts two claims*, each

worth $10,000, and the injury he inflicted on the bankrupt or its creditors amounted to

$10,000, only one of his claims should be subordinated."  *Mobile Steel,* 563 F. 2d at 701

(emphasis added).  That illustration did not indicate whether both claims were related to

any inequitable conduct, but simply set forth the principle that the remedy is limited to

the extent of injury.  However, the *Mobile Steel* court's statement that inequitable

conduct does not have to be related to such claims to justify subordination, *Id*. at 706,

supports the conclusion that the remedy of equitable subordination can be applied against claims not related to any inequitable conduct.

Regarding which claims the remedy should be applied to first, the *Westgate-California* analysis and the *Mobile Steel* discussion support the view that subordination should be applied against the claim related to the inequitable conduct in the first instance, and then, be against the unrelated claims to the extent necessary to remedy the remaining otherwise uncompensated injury.  The Court notes that this may not be the only methodology for applying the remedy of equitable subordination.  However, it is not necessary to determine the appropriate methodology, or methodologies, for applying the remedy in this Opinion.

Finally, "[s]ubordination is an equitable power and is therefore governed by equitable principles." *Westgate-California,* 642 F.2d at 1177.  Bankruptcy courts are empowered by this common law concept of the equitable doctrine to subordinate claims where the subordination will promote a just and equitable distribution of the bankruptcy estate.  No case has specifically limited a court's exercise of this equitable doctrine to the subordination of claims only related to the inequitable conduct where the uncompensated injury exceeded the amount of the claims related to the inequitable conduct.

Generally, courts have dealt with the subordination of claims related to inequitable conduct.  Nonetheless, the legal principles of subordination and the case law, as discussed above, support the conclusion that a court can subordinate a claim unrelated to the inequitable conduct when it is necessary to provide the other members of the injured creditor class the full benefit of the remedy for the injury resulting from the claimant's misconduct.  This conclusion conforms with public policy underlying the

Bankruptcy Code that a court can exercise its authority to subordinate a claim in order to rectify the harm to the estate or its creditors and achieve a fair distribution to creditors. If Congress had intended to limit equitable subordination to only those claims directly related to the inequitable conduct, it would have manifested such intent.

In conclusion, equitable subordination may reach any claim necessary to effectuate the remedy set forth in section 510(c) of the Bankruptcy Code limited only by the extent of otherwise uncompensated injury to the related creditor class. Therefore, equitable subordination is not limited to only those claims related to the inequitable conduct. Subordinating any amount of claim in excess of the established injury sustained would be punitive, and not consistent with the principles of equitable subordination nor permissible. However, limiting the remedy of subordination to the claims related to the inequitable conduct could deprive the estate or the injured creditors of the full benefit of the section 510(c) remedy, and as well, would not be consistent with the principles of equitable subordination. Further, such a holding would confer an unfair advantage on certain groups of claimants who engage in misconduct over the other members of the injured creditor class and frustrate a fundamental purpose of the Bankruptcy Code to achieve a just and fair distribution of the estate.

II.    *Application of Equitable Subordination to Transferred Claims*

As previously set forth, the Claim is not related to the inequitable conduct alleged against CSFB; however, having found that a court can subordinate a claim under section 510(c) of the Bankruptcy Code unrelated to the inequitable conduct, the Court must now determine whether such claim remains subject to equitable subordination in the hands of any transferee to the same extent that it would have been subject to subordination in the

hands of the transferor.  Enron argues that the transfer of a claim should have no impact

on the issue of the application of the remedy of equitable subordination against such

claim, if that claim would have been subject to subordination in the hands of the

transferor.  Bear argues that section 510(c)(1) of the Bankruptcy Code does not permit

the imputation of a transferor's inequitable conduct to a transferee for purposes of

equitable subordination.[8]

There is no basis to find or infer that transferees should enjoy greater rights than

the transferor.  On the contrary, case law has affirmed the principle that under a

bankruptcy proceeding, "[a]n assignee stands in the shoes of the assignor and subject to

---

[8]  The Court notes that the cases cited by Bear to support its proposition do not concern a transferor-transferee relationship.  For example, one cited case discusses a principal-agent relationship, stating that an individual owner's misconduct is not imputed to a corporation entirely owned by such owner without further findings concerning the existence of a principal-agent relationship and alter ego.  *Westgate-California Corp. v. First Nat'l. Fin. Corp.*, 650 F.2d 1040, 1043-44 (9th Cir. 1981) (noting that subordinating a corporation's claims was not justified based on the inequitable conduct of an individual owner of this corporation, without finding that such owner acted as the agent of this corporation when he committed the inequitable conduct and without finding the corporation was the owner's alter ego so as to justify the disregard of this corporation's separateness as a corporate entity).  In *Westgate-California Corp.,* the corporation's claims were never held and transferred by such individual owner to the corporation.  The claims belonged to the corporation, a separate entity from the owner of the corporation.  In the instant matter, the transferor-transferee relationship is central.  The obligations of the Claim traveled from the transferor (i.e., CSFB) to the transferee (i.e., Bear) (additional discussion follows in the text).

In addition, Bear cites *Wilson v. Huffman* to support its argument that an assignor's alleged bad conduct can only be imputed to the assignee where the assignee was aware or somehow implicated in the wrongdoing at issue.  In *Wilson v. Huffman,* because a claimant was the principal of the partnership formed by such claimant and another partner and involved in the partnership's transactions, the court found that such claimant's claims could be subordinated on the basis of his partner's identifiable inequitable conduct. 818 F.2d at 1146.  Bear seeks to rely on a comment made by the *Wilson v. Huffman* court in positing a hypothetical where the court stated

we do not express an opinion on a hypothetical case in which a note is some way passed by an inequitable actor to an innocent uninvolved bystander. In that hypothetical situation, one which is not presented in this case, there *might* be reasons to find that subordination of a note would be contrary to the principles of equitable subordination as they have developed in the court.  (Emphasis added).

*Id*.  However, the *Wilson v. Huffman* court's statement concerning the hypothetical is dicta and not controlling here or persuasive, as that court did not conduct an analysis of a transferor-transferee relationship.  Further, although there *might* be reasons not to apply subordination in the hypothetical described, as discussed throughout this opinion, the equitable considerations based upon the circumstances set forth herein, warrant a finding that a claim that would be subject to equitable subordination in the hands of the transferor should be subject to subordination to the same extent in the hands of any transferee (additional discussion follows in the text).

all equities against the assignor." *Goldie v. Cox*, 130 F. 2d 695, 720 (8th Cir. 1942)

(citing *Fidelity Mut. Ins. Co., v. Clark,* 203 U.S. 64, 74 (1906)). The *Goldie* court found

that "[u]nless these claims (or at least enough of them to satisfy the assignment) can be

allowed to claimant, the assignee would fare likewise." *Id*. The legal effect of the claim

is not to extinguish the underlying obligation of the claim, but assign it to the transferee.

*See Dorr Pump & Mfg. Co. v. Heath et al. (In re Dorr Pump & Mfg. Co.)*, 125 F.2d 610,

611 (7th Cir. 1942). The transfer of a claim does not change the nature of the claim

against the transferor. *See Carnegia v. Georgia Higher Educ. Assistance Corp.,* 691 F.2d

482, 483 (11th Cir. 1982). The Second Circuit confirmed that an assignee succeeds to all

the rights of the assignor. *See Citibank, N.A. v. Tele/Resources, Inc.,* 724 F.2d 266, 269

(2d Cir. 1983).

　　　　In addressing the impact of a transfer on the statutory priority of a claim, the

Supreme Court held that the assignment of a claim cannot change the priority of such

claim for wages under the Bankruptcy Act (July 1, 1898). *See Shropshire, Woodlife &*

*Co. v. Bush et al.,* 204 U.S. 186, 189 (1907). In a case decided under the Bankruptcy

Code, the Fifth Circuit affirmed the principle set forth by *Shropshire* and indicated that,

unless there is clear legislative intent in the Bankruptcy Code itself not to allow the

transferees to stand in the shoes of the transferors, the transferees' position does not

change by the transfer. *See Wilson v. Brooks Supermarket, Inc., (In Re Missionary*

*Baptist Found. of Am.),* 667 F.2d 1244, 1247 (5th Cir. 1982). In *Missionary Baptist*, the

court noted as follows

> [a]t least, in the absence of indicia of a legislative intent to overrule the
> sound policy reflected by these decisions, we adhere to the rationale of the
> pre-1978 decisional law that accorded the same priority to claims based on

assignments by the wage earner as to claims for wages made by the wage earner himself.

*Id.* Thus, the Fifth Circuit found that the priority of a claim is not altered by its transfer to another.

The remedy of subordination is authorized under section 510(c) of the Bankruptcy Code, pursuant to which a court may exercise its equitable power consistent with common law principles to adjust the order of payments to creditors to achieve equitable levels of distributions based upon their comparative claim positions. Therefore, although the aforementioned case law addresses statutorily defined priority issues, there is no reason not to apply the same principles under that case law to the issue before the Court. It follows that the priority of a claim resulting from equitable subordination should not be impacted by a transfer. Once it is established that a claim in the hands of the transferor would be subject to subordination, such claim in the hands of a transferee should fare no differently. Rather, it should be subordinated to the same extent that such claim would be subject to equitable subordination in the hands of the transferor. The purchase of a claim in a bankruptcy proceeding should not grant a transferee any greater rights than the transferor had. The risks inherent in bankruptcy proceedings are merely shifted to another who stands in the shoes of the original or previous claimant.

Such determination is consistent with the policy consideration and the three-prong test concerning equitable subordination judicially developed by the *Mobile Steel* court. 563 F.2d at 700; *see also Sunbeam,* 284 B.R. at 362-63. In order to determine whether equitable subordination applies, the Court will first consider the alleged misconduct according to the first prong of the *Mobile Steel* test. However, the Court has found no case that has limited such consideration in the context of a transferred claim to only the

conduct of the current holder.  Bear argues that section 510(c) of the Bankruptcy Code

only applies to claimants engaged in inequitable conduct, not to claims.  According to

Bear, because of the absence of a finding concerning Bear's misconduct, the first prong

of the *Mobile Steel* test cannot be satisfied.  As a result, the Claim cannot be subject to

subordination.  The Court disagrees and finds that the equitable subordination analysis is

not solely limited to consideration of the conduct of the current claimholder.

The Supreme Court answered the issue of whether the right to an assigned claim

for wages attaches to the claimant or to the claim.  *See Shropshire,* 204 U.S. at 188.  In

*Shropshire,* the Supreme Court made clear that "if [the right to an assigned claim for

wages attaches] to the person, it is available only to him, if to the claim, it passes with the

transfer to the assignee."  *Id.*  It concluded that the right to an assigned claim for wages

attaches to the debt, and not to the person of the creditor; to the claim, and not to the

claimant.  *Id*. at 189.  It reasoned that bankruptcy law does not "expressly" or "by fair

implication" state that the right to a claim for wages must be due to the claimant at the

time of the presentment of the claim, and thus, restricting the right to the claimant was

not warranted.  *Id*.

The principle set forth by *Shropshire* can be applied to the instant case.  Section

510(c) of the Bankruptcy Code does not "expressly" or "by fair implication" state that

subordination only applies to the original claimant.  By examining the plain language of

the statute, only "claim" rather than "claimant" is mentioned under section 510(c)(1) of

the Bankruptcy Code, which provides that a court may "under principles of equitable

subordination, subordinate for purposes of distribution all or part of an allowed *claim* to

all or part of another allowed *claim* or all or part of an allowed interest to all or part of

another allowed interest." 11 U.S.C § 510(c)(1) (emphasis added). Had Congress meant
for the application of equitable subordination to be limited to an original claimant or a
claimant at the time of the presentment of the claim, rather than the "claim" itself, it
would have provided such limitation.

Thus, the adjustment of priority of a claim resulting from subordination is
attached to such claim and it travels with any subsequent transfer. The transfer of a claim
subject to subordination in the hands of the original holder does not extinguish the
claim's susceptibility to subordination. Rather, that legal effect is transferred to such
transferees. Thus, the subsequent transferees are subject to equitable subordination as
such relief could have been sought against an original claimant who engaged in
misconduct.

Apart from the legal analysis set forth above, the Court also considers the policy
arguments advanced by both parties. Enron argues that the consequences of shielding
transferred claims from subordination would be detrimental to the Debtors' estates and to
the other members of the injured creditor class who could not protect themselves against
the transfer of bankruptcy claims. One of the consequences would be to encourage the
creditors, who have engaged in inequitable conduct, to "wash" the claims free of any
possibility of equitable subordination by simply transferring them. Enron argues that if
the wrongdoers were allowed to sell their claims free of the risk of subordination, they
would unfairly benefit from their wrongs.

In response to Enron's arguments, Bear contends that there is no evidence to
support Enron's allegation that CSFB would have an incentive to "dump" the claims in
the claims-trading market at the discounts that the trading market demands. Further, Bear

urges the Court not to stretch the coverage of the statute to deal with the policy concern
of "claim washing" because there is no evidence in the body of jurisprudence dealing
with claims-transfers, in any study, nor in any law review that suggests that "claim
washing" is an actual "real world" problem.

Bear maintains that Enron has a remedy available to rectify the previous
claimholder's inequitable conduct, in that Enron may pursue the previous claimholder for
recovery. Applying this procedure, however, would require a debtor to make
distributions to all current claimholders, including the transferee who holds a challenged
claim. That debtor would then be required to recover damages for the inequitable
conduct from the original holder of the claim who engaged in inequitable conduct. In
contrast, the procedure proposed by Enron allows a debtor to refrain from making any
distribution on account of any claim arising from misconduct, unless and until the injured
creditor class is fully satisfied.

Here, the Court focuses on the policy ramifications resulting from a judicial
holding that would place the burden on a debtor's estate to recover the funds distributed
on the claims subject to subordination from the original holders of the claims, instead of
simply not distributing any funds on such claims to the current claimholders until other
class claimants are paid in full. The Court does not speculate as to the extent to which
the unavailability of the remedy of subordination of claims would provide alleged
wrongdoers with an incentive to engage in "claim washing." Nor does the Court question
that the financial institutions that are alleged to have engaged in inequitable conduct may
well have independent business reasons[9] to transfer claims to third-party investors.[10]

---

[9] It has been noted that claim sellers transfer claims to avoid the administrative hassle and costs of
bankruptcy proceedings; or to establish a tax loss on their investment; or meet the regulatory requirements,

However, there is no doubt that a party from which the estate would have to recover damages relating to equitable subordination would be in a superior position than a party to which the estate could simply, if otherwise warranted, subordinate its claims. Burdening of the estate with the necessity of collecting damages to effectuate the remedy of equitable subordination would undermine the remedy itself.

As the Court mentioned previously, the Court must ensure that the purpose of the bankruptcy statute is achieved. Thus, a creditor who is found to have engaged in inequitable conduct should not be permitted to frustrate, hinder, dilute or in any way delay the distribution to the other members of the injured creditor class by means of transferring its claims. The Court is concerned that if a debtor were forced to pursue the transferor, it would defeat the goal of section 510(c) of the Bankruptcy Code, and at a minimum, hinder, dilute or frustrate the distribution. The Court disagrees with Bear's proposition that it should not be sued for subordination because Enron has a remedy against CSFB, a solvent institution which would be bound by any judgment issued by the Court. Whether the transferor is solvent is irrelevant. The remedy under section 510(c) of the Bankruptcy Code is intended to apply without the debtor having to engage in a collection effort. If Bear's approach were adopted, a debtor would have to continuously monitor the transfer of claims and the solvency of the original transferor. There is no basis to burden the estate with such monitoring.[11]

---

including Basel Accord capital requirement, auditing rules for balance sheet asset write-offs or mark-to-market accounting requirements for securities. *See* Paul M. Goldschmid, *More Phoenix than Vulture: The Case for Distressed Investor Presence in the Bankruptcy Reorganization Process*, 191 COLUM. BUS. L. REV. 192, 206-07 (2005).

[10] In addition, the Court recognizes that the existence of a market to transfer claims is commonly viewed to provide a source of liquidity to the original or subsequent holders of the claims, including financial institutions that provide pre-petition loans to the debtors.

[11] Further, the conclusion that flows from Bear's argument is that if the transferor were not solvent, that a transferee, who pays value, would then become subject to equitable subordination. This argument has no

In the current claims-transfer market, claims are often transferred several times, and the ultimate holder of the original claims is the end transferee in a multiple-transfer chain. Practically, regardless of whether the prior holders are solvent, if the remedy of subordination of such claims in the hands of a transferee were not available to the debtor, the estate would be administratively burdened by having to pursue original holders to recover any amount paid on the claims that would have been subordinated in the hands of the prior holders.

With the availability of the remedy of subordination of the claims against the transferees, the estate can withhold the funds in connection with these claims from its reserve and distribute them to the creditors. Otherwise, in order to "claw back" those funds for distribution to creditors, the estate would be forced to initiate collection lawsuits against each of the original or previous holders who engaged in inequitable conduct. As a result, the litigation process would not only prolong the time required to collect these funds for distribution to the creditors, but also would create uncertainty concerning recovery of these funds for the estate. Unavoidably, the consequence of being unable to subordinate claims in the hands of transferees would delay the ultimate distributions by the debtor, which delay is contrary to the goal of the Bankruptcy Code.

Further, in addition to placing an administrative burden on the estate, Bear's approach would have a compound effect on the distribution. Not only would the creditors be subject to a delay in the distribution process but also, unless funds in excess

---

support in case law or any principles discussed in Bear's arguments. If followed, this approach would result in a remedy that would be nearly impossible to effectuate and result in enormous administrative costs by requiring constant monitoring by the debtor of the financial condition of claimholders. Further, this argument is fundamentally inconsistent with the "good faith" defense analogy argued by Bear, as discussed in section III. It is inconsistent because it would result in the transferee's liability being dependent upon the solvency of the transferor – a test that would have nothing to do with a transferee who pays value.

of the amount due from the claimant subject to equitable subordination are recovered

from the wrongdoers, the creditors would not receive the same amount in distribution that

they would have had the transferee's claims been treated as if they were still in the hands

of the transferor. Thus, in order to fully rectify the harm arising from the misconduct to

the estate and its creditors, the estate would have to recover a greater amount than would

have been distributed to the transferee claimant.[12]  The consequence would place

---

[12] The following example illustrates the consequences of each party's treatment of a claim in the hands of a subsequent transferee. A hypothetical estate has $200 of value to distribute to its creditors. Five creditors (the "Creditors") hold claims against the estate valued at $100 each (together, the "Claims"), for an aggregate total of $500 in claims against the estate. One of the Claims in the hands of the transferor ("Transferor"), however, was subject to equitable subordination (the "Tainted Claim"). Under the approach advocated by Enron, the Tainted Claim would remain subject to equitable subordination, regardless of any subsequent transfer that took place. The transferee of the Tainted Claim (the "Transferee") would be ineligible to receive a distribution, leaving the four remaining other members of the creditor class (the "Innocent Creditors") to share *pari passu* in the $200 value of the estate. Each Innocent Creditor would therefore receive a total distribution of $50. Thus, if the Tainted Claim were subject to equitable subordination in the hands of the Transferee, distributions would be made as follows

| | |
|---|---|
| Assets available for distribution | $200 |
| Number of claims, including Tainted Claim | 5 |
| Number of tainted claims | 1 |
| Amount of each claim | $100 |
| Number of claims to receive distributions | 4 |
| Pro rata distribution* to each of the claimants, except the Tainted Claim | $ 50 |
| Distribution to Tainted Claim | $  0 |
| Total distribution to each | $ 50 |
| Total distributions (4 X $50) | $200 |

*The mechanics of the distribution model is that the subordinated claim receives a constructive pro rata distribution ($200/5 = $40) as if the claim were not subject to subordination. Then, that constructive amount ($40) is returned to the estate and, thereafter, the pro rata distribution is made to the (4) claimants not subject to subordination ($200/4 = $50). The Court notes that under the Enron Plan, the mechanics of the distribution is far more complex, but the principles and consequences set forth herein are equally applicable.

  Under the approach put forth by Bear, the Tainted Claim would not be subject to equitable subordination in the hands of a good faith transferee. Thus, each of the four Innocent Creditors and the Transferee would share *pari passu* in the $200 estate, with each receiving $40 on their claims. The burden would then be placed on the debtor to pursue an action against the Transferor of the Tainted Claim to recover the distribution to the Transferee. This $40 recovery would then be distributed among the five claimants, with each receiving an additional $8.00 on their claims. Since each claimant would receive a total of $48, the Innocent Creditors would receive $2.00 less than what would be received under the course of action advocated by Enron. This, of course, assumes that a full recovery could be made against the Transferor, and does not factor in the legal costs, among other things, that would be incurred by the debtor's estate in the process. Therefore, if the Tainted Claim were not subject to equitable subordination in the hands of the Transferee, distributions would be made as follows

unwarranted additional burdens on those creditors who were already harmed by the inequitable conduct. Further, even if a full recovery were received, delay would be unavoidable.

Lastly, Bear contends that a judicial determination that the Claim should be subordinated would seriously and needlessly undermine confidence in the system of post-petition transfers and impact the liquidity of the market for post-petition transfers of claims. Bear further argues that the consequence of allowing subordination of the Claim in the hands of Bear would create uncertainty and be burdensome to the general

| | |
|---|---|
| Assets to be distributed by first distribution | $200 |
| Number of claims | 5 |
| Number of claims to receive distributions, including Tainted Claim | 5 |
| Amount of each claim | $100 |
| Number of claims not receiving a distribution | 0 |
| Pro rata distribution to each of the claimants under first distribution | $ 40 |

Thereafter, the debtor must seek to recover the amount of the distribution paid to the transferee on the Tainted Claim. If recovered, that amount is paid into the estate available and made available for distribution as follows

| | |
|---|---|
| Assets recovered from transferor/available for distribution | $ 40 |
| Pro rata distribution to each of the claimants under second distribution | $  8 |
| Total distribution to each claimant, including transferee | $ 48 |
| Total distributions (5 X $48) | $240 |

Under Bear's approach, an Innocent Creditor would receive less on their claim, and would therefore be deprived of the full benefit available under section 510(c) of the Bankruptcy Code. Thus, in order for the Innocent Creditors to recover the full benefit that would have been available had the claim not been transferred, the debtor would have to recoup (1) litigation costs, (2) any loss of value resulting from the delay in distribution, and (3) the $2.00 difference in the pro rata distribution that resulted from distributions being made to five, as opposed to four, creditors. Additionally, it would be the estate that would ultimately bear the risk of recovery against the transferor, as well as related costs. If recovery were unsuccessful, not only would the Innocent Creditors lose the benefit of equitable subordination, they would also suffer the additional consequences of the fees and expenses incurred in the unsuccessful recovery process. Such a burden is not contemplated by section 510(c) of the Bankruptcy Code, and would not arise if a claim in the hands of a transferee remained subject to equitable subordination.

Regarding the amount of damage resulting from inequitable conduct, in *Citicorp Venture Capital, Ltd. v. Comm. of Creditors* (*In re Papercraft Corp.*), 323 F.3d 228, 234 (3d Cir. 2003), the court concluded that costs arising from a claimant's misconduct, such as related litigation and administrative costs, can be included in the damage calculation. Whether the damage calculation can include costs, other than related litigation and administrative costs, such as those discussed above, is an issue that would have to be addressed if Bear's approach were adopted. Further, although the consequences of Bear's approach may be addressed by way of settlement with the transferor, nonetheless, the burden of those consequences, including litigation risks, improperly placed upon a debtor in that process.

transferees.  It bases this argument on the fact that the banks are involved in hundreds of

transactions with a debtor, therefore, as a practical matter, it would be impossible for

them to conduct due diligence on all transactions in which they purchase claims.

Participants in the claims-transfer market are aware, or should be aware of, the

risks and uncertainties inherent in the purchase of claims associated with post-petition

debtors, including the possibility of claims being subordinated, and they assume the

liabilities arising from the post-petition transfer of claims.  As noted by the Supreme

Court in *Fidelity Mut. Life Ins.,* the transferees are subject to the equities existing at the

time of the transfer.  203 U.S. at 74.  The purchase of a claim, itself, evidences the

transferee's willingness to assume the risks attendant to a bankruptcy proceeding (see

more related policy arguments in Section III of this Opinion).  The risk that full recovery

may not be available is a risk factor that must be assessed by a claim-purchaser.[13]

Moreover, in order to protect the interests of both transferors and transferees, the

industry has promulgated standardized provisions relating to transferred rights, assumed

obligations, buyer's rights and remedies.  *See* LSTA Standard Terms and Conditions on

---

[13] The Court notes that the risk of buying claims in a bankruptcy proceeding has been identified in the
distressed debt industry for at least a decade.  "As a general legal principle, an investor who purchases a
distressed claim enjoys the same 'rights and disabilities' as the original claimholder."  *See* Stuart C. Gilson,
*Investing in Distressed Situations: A Market Survey.*  FINANCIAL ANALYSTS J. 8, 10 (November-
December 1995).  This article was contained in the material provided to attendees at the Distressed
Investing seminar in 2004 where Prof. Gilson was a participant on a panel entitled – Valuation Workshop:
Distressed Airlines.  In the article, Prof. Gilson warned that a post-petition claim-purchaser inherits
liabilities, including equitable subordination from the original transferor that such transferee had no role in
creating.  *Id.* at 15.  "In Chapter 11, an investor in distressed debt risks having the debt 'equitably
subordinated' – made less senior – if the selling creditor is found to have engaged in 'inequitable conduct'
that resulted in harm to other creditors or gave the selling creditor's claim an unfair advantage in the case."
*Id.* at 16.  "As a result of these considerations, investors who are more familiar with the borrower's
operations and management (e.g., as a result of past business dealings or superior research) have an
increasing comparative advantage in assessing these risks and in accurately valuing distressed claims."  *Id.*

the Purchase and Sale Agreement for Distressed Trades (the "Distressed Trades

Agreement") published by the Loan Syndications and Trading Association, Inc.[14]

  To eliminate such risks by providing special protection to the purchasers of claims

subject to subordination in the hands of a transferor would create a "special" class of

claimholders.  The creation of such a special class would have no support in the

Bankruptcy Code or case law.  It is the role of Congress to provide special protection to

claims' transferees to the extent it determines that the need to afford such protection to

them would outweigh the additional burden placed on the estate and the other members

of the injured creditor class to receive the intended benefit of section 510(c) of the

Bankruptcy Code.  Additionally, if wrongdoers were allowed to profit by selling their

claims, then the other members of the injured creditor class would effectively be forced

to share their recoveries from the debtor's estates with the wrongdoers, and be forced to

---

[14] Under section 4, the seller warrants that the claims are "free and clear" of any encumbrance. *See* Purchase and Sale Agreement for Distressed Trades published by the Loan Syndications and Trading Association as of May 1, 2005; attached to the Declaration from Richard K. Milin. Specifically, under section 4.1 (w)(ii), "[S]eller represents and warrants to Buyer that Seller has not received any written notice other than those publicly available in the Bankruptcy Case (if any) or otherwise, that the Transferred Rights, or any portion of them, are void, voidable, unenforceable or subject to any Impairment." *Id.* "Impairment" means "any claim, counterclaim, setoff, defense, action, demand, litigation . . . right (including expungement, avoidance, reduction, contractual or *equitable subordination*, or otherwise)." *Id.* (emphasis added).  Under section 6, "Seller shall indemnify, defend, and hold Buyer and its officers, directors, agents, partners, members, controlling Entities and employees harmless from and against any liability, claim, cost. Loss, judgment, damage or expense . . . that any Buyer Indemnitee incurs or suffers as a result of, or arising out of (1) a breach of any of Seller's representations, warranties, covenants or agreements in this Agreement . . . ."  Further, under section 6(1)(a) the buyer is entitled to indemnification from the seller if condition, including disallowance and subordination, results in buyer's receiving proportionately less in payments or distribution or less favorable treatment than other *parri passu* creditors. *Id.*  Under section 5(f), the buyer of the distressed claims warrants himself to understand and assume the risks arising from the purchase of the claims.  *Id*.
 Further, the Court notes that because of the availability of the indemnification remedy under the transfer agreement, UBS A.G. ("UBS") initiated an action (Docket No. 05-01061) against a prior claim holder, IntesaBci, S.P.A., who entered into a transfer agreement with UBS, for indemnification of the loss on disallowance and subordination of the claims arising from the alleged misconduct by Toronto Dominion Bank, a defendant under the Megacomplaint Proceeding.  Attached to the Declaration from Richard K. Milin.

engage in litigation seeking recovery of damages resulting from the consequences of the transfer.

When one balances the harm to the other members of the injured creditor class as against the risks to a claim-purchaser, the interests of the other members of the injured creditor class prevail.  A claim-purchaser, by definition, engages in a high-risk transaction with a number of risks, including the potential for equitable subordination of the claim.  Allowing a claim-purchaser to prevail would be inconsistent with public policy, as the Court mentioned previously.  Therefore, the equitable doctrine provides another basis for the Court to subordinate any claims in the hands of the transferees[15] if the three-prong *Mobile Steel* test is established as to the transferor.

In conclusion, the Court holds that the transfer of a claim does not shield such claim from equitable subordination in the hands of a transferee.  The Court determines that the application of equitable subordination is not solely limited to the claimant who is found to have engaged in the conduct that is the subject of an equitable subordination complaint.  Rather, any transferee is subject to all equitable relief sought against the

---

[15] Bear also argues that not all categories of debt, such as bonds, are traded in the claims-transfer marketplace where the trading parties are free to negotiate representations, warranties, indemnities and other protection devices.  The purchase of bonds and notes are not at issue before the Court in the instant proceeding.  However, the Court notes that the post-petition purchaser of such debt instruments either knows or should know that the issuer of these securities is a debtor, so the prices of these transfers would reflect the attendant risks that the claims might be subordinated.  Under those circumstances, the purchaser may well not have any available indemnity remedy against the seller, as is the case with the claims trading.  But it is the market place that should address such risks in its pricing.  Apprehending higher risk associated with these securities, the purchaser may demand further discounts on the prices.  And based on the Court's previous policy analysis, no legal and policy basis supports the premise that transferees of bonds or notes should be treated differently than those holding the transferred loan claims.  All the post-petition transferees assume the risk that their claims may be subject to subordination (see additional policy arguments in section III of this Opinion).

 Further, a party who enters into a pre-petition agreement under which such party agrees to accept a transfer of proofs of claim in the event of the bankruptcy of a party to such agreement, should fair no better that a post-petition claim-purchaser.  By agreeing to accept the transfer of claims, a party assumes the same risks, including that the transferor engaged in conduct that could result in equitable subordination of the transferee's claims, as a claim-purchaser.

claimant whose conduct would warrant the finding of equitable subordination. Simply, the equitable relief available under the doctrine of equitable subordination remains with the claim. Any other result would be contrary to the purpose of the Bankruptcy Code not to hinder or dilute the distribution of funds by the estate or possibly foreclose the prospect of a debtor's recovery. Therefore, if the Court determines that the otherwise uncompensated injury caused by CSFB would have reached the Claim had they remained in the hands of CSFB, then the Claim in the hands of Bear, as the transferee would be subject to subordination as if the Claim was still held by CSFB, notwithstanding a finding that Bear did not engage in any misconduct. Further, the equitable doctrine supports the proposition that there is no basis to distinguish the treatment of a claim in the hands of the transferee from its treatment in the hands of the transferor prior to the transfer.

## III.    "Good Faith" Defense

Bear argues that even if equitable subordination applies to the Claim, as an innocent transferee, it is entitled to assert a "good faith" defense. Under the third prong of the *Mobile Steel* test, subordination of a claim must be consistent with the provisions of the Bankruptcy Code. *Mobile Steel,* 563 F.2d at 700. This element is "a reminder to the bankruptcy court that although it is a court of equity, it is not free to adjust the legally valid claim of an innocent party who asserts the claim in good faith merely because the court perceives that the result is inequitable."[16] *Noland,* 517 U.S. at 539 (citations

---

[16] *Noland* holds that a court's discretion in applying equitable subordination under section 510(c) of the Bankruptcy Code is not limitless. 517 U.S. at 535. In *Noland,* the court reversed the lower courts' affirmation of a bankruptcy court's decision that modified the priorities set forth by Congress by denying administrative expense priority to a post-petition tax penalty. *Id.* Simply, a valid claim that is asserted in good faith cannot be subordinated, as such subordination would be inconsistent with the priority scheme established by Congress. *Id.* at 539-41. The instant case can be distinguished from *Noland*. In *Noland,* the term good faith is referenced in the context of the assertion of the claim by its original holder. *Id.* at 539. Additionally, there was no dispute that the claim was asserted in good faith; as a result, the court in *Noland* did not further discuss the application of good faith under section 510(c) of the Bankruptcy Code. More

omitted).  "[T]he circumstances that prompt a court to order equitable subordination must

not occur at the level of policy choice at which Congress itself operated in drafting the

Code."  *Id.* at 543.

Here, Bear does not argue that subordination of the Claim would be inconsistent

with any provision of the Bankruptcy Code.  Rather, it contends that the policy

underlying various provisions of the Bankruptcy Code that deal with avoided transfers, in

particular section 550 of the Bankruptcy Code, protects good faith transferees.  Section

550 of the Bankruptcy Code prevents a trustee from recovering the transferred property

from a transferee who pays value, in good faith and without knowledge of the voidability

of the transfer at issue, or any immediate or mediate good faith transferee of such

transferee.[17]  Bear acknowledges that the language of section 510(c) of the Bankruptcy

Code does not explicitly provide for a good faith defense for a transferee of a claim.[18]

However, Bear contends that the "good faith" defense under section 550(b) of the

---

importantly, in the instant case, except for Bear's good faith policy argument by analogy to section 550 of
the Bankruptcy Code, it is clear that equitable subordination of the Claim would not be inconsistent with
any provision of the Bankruptcy Code established by Congress (additional discussion follows in the text).

[17] Section 550(a) of the Bankruptcy Code provides that ". . . the trustee may recover, for the benefit of the
estate, the property transferred . . . the value of such property, from -
    (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
    (2) any immediate or mediate transferee of such initial transferee."
  Section 550(b) provides that "[t]he trustee may not recover under section (a)(2) of this section from -
    (1)  a transferee that takes for value, including satisfaction or securing of a present or antecedent
        debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
    (2)  any immediate or mediate good faith transferee of such transferee.
11 U.S.C. §550(a) and (b).  The Court notes that there is a limitation on the trustee's right to recover
property from certain subsequent transferees under section 550(b).  "The scope of subsection (b) does not
include an initial transferee under subsection (a)(2) of the debtor or an agent of the debtor even if the initial
transferee takes in good faith and for present fair equivalent value."  *See* 5 Collier on Bankruptcy, ¶ 550.03,
at 22.

[18] Other than the reference to the term good faith mentioned in *Noland,* as discussed in footnote 16, the
only reference in the case law applying section 510(c) to the "good faith" defense involves the assertion of
equitable subordination against insiders.  *Lemco Gypsum,* 911 F.2d at 1557 (noting that after a party
seeking equitable subordination of an insider claim presents material evidence of unfair conduct, the insider
claimant can protect its claim from subordination by proving the good faith and fairness of its dealings with
the debtor); *see also Mobile Steel,* 563 F.2d at 701.  In that context, it is raised to refute allegations of
"unfair" conduct by the insider regarding the insider's relationship with the debtor.  Bear does not contend
that the "good faith" defense available to insiders under section 510(c) should apply to it.

Bankruptcy Code should be extended to purchasers of claims.  It argues by analogy that

section 550 of the Bankruptcy Code supports its view that Congress did not intend to

punish a good faith transferee of a claim by applying equitable subordination to the

transferred claim.  Essentially, Bear argues that not allowing such defense would be

inconsistent with the policy underlying the various provisions of the Bankruptcy Code

that permit a "good faith" defense by a transferee.

In the instant case, Bear maintains that it acted in good faith and paid fair value

for in the purchase of the Claim.  It further claims that there is no dispute that it did not

engage in any misconduct in the post-petition purchase of the Claim.  Finally, it asserts

that it acted in good faith on the ground that it had no knowledge of any allegations on

the Claim asserted in the Megacomplaint Proceeding when it purchased the Claim.  Bear

argues that it has established a "good faith" defense and therefore, the cause of action

based upon equitable subordination should be dismissed.

With respect to Bear's argument seeking the extension of the "good faith" defense

under section 550(b) of the Bankruptcy Code to the claims-transfer process, the Court

finds that such extension is not warranted.  Section 550 of the Bankruptcy Code, entitled

"Liability of Transferee of Avoided Transfer," which includes the "good faith" defense

under subsection (b), was not intended by Congress to deal with the equitable

subordination of claims under section 510(c) of the Bankruptcy Code.  Section 550(a) of

the Bankruptcy Code specifically deals with a transfer that is avoided under section 544,

545, 547, 548, 549, 553(b), or 724(a).  *See* 11 U.S.C § 550(a).  Section 550(a) of the

Bankruptcy Code also specifically refers to recovered property, or the value of such

property, and is specifically meant "for the benefit of the estate."  *Id.*  Congress did not

42

include section 510(c) among those referenced in section 550(a) because section 510(c) concerns equitable subordination of *claims against the debtor*. The sections referenced in 550(a), and their recoveries for the benefit of the estate, are distinct from the subordination of claims under section 510(c) of the Bankruptcy Code. Section 510(c) of the Bankruptcy Code does not provide any recoveries "for the benefit of the estate," and does not deal with avoidable transfers. The section does not concern property or value that could be recovered "for the benefit of the estate." Had Congress meant to apply the "good faith" defense of section 550(b) to the transfer of claims equitably subordinated by section 510(c), it would have included section 510(c) among the sections referenced in 550(a).

Section 550(b) of the Bankruptcy Code protects a good faith transferee from challenges to the propriety of the transfer of the property at issue. It limits the circumstances under which a trustee or debtor in possession could recover property or its value from a purchaser for the benefit of the estate. Its protections do not have any impact on the rights and obligations that may attach to the property. The policy underlying the "good faith" defense, which is to protect certain innocent purchasers from challenges to the underlying transfer, is not implicated here. This is because when applying equitable subordination, there is no challenge to a party's rights to the property or to any of the estate's value that was inappropriately taken – the claim still belongs to the transferee. Instead, the assertion of equitable subordination affects the priority of that claim within a creditor class. "Subordination of a claim alters the otherwise applicable priority of that claim [within a creditor class]; a subordinated claim receives a distribution

only after the claims of other creditors have been satisfied." 5 Collier on Bankruptcy, ¶ 510.01, at 3; *see also Mobile Steel*, 563 F.2d at 699.

Here, the Claim at issue is not the property of the estate. There is no policy rationale that necessitates protection of a claim-purchaser, which was never property of the estate, from the risks attendant to a bankruptcy proceeding. This is especially so when such purchaser, by definition, voluntarily enters into such proceeding. The policy considerations of the "good faith" defense under various provisions of the Bankruptcy Code are not implicated in the claims-transfer process. Therefore, as stated previously, the extension of the "good faith" defense to the claims-transfer process is not warranted.

Nevertheless, for the sake of completeness, and to amplify the lack of contextual nexus of the "good faith" defense to a transferred claim, the Court will consider the rationale of allowing Bear, as the transferee of the Claim, to assert the "good faith" defense, analogous to section 550(b), or any other section, of the Bankruptcy Code.

As stated above, the concept of "good faith" was developed by the common law, rather than defined in the Bankruptcy Code. "Good faith purchaser," also termed "bona fide purchaser" is defined as "[o]ne who buys something for value without notice of another's claim to the property and without actual or constructive notice of any defects in or infirmities, claims, or equities against the seller's title; one who has in good faith paid valuable consideration for property without notice of prior adverse claims." BLACK'S LAW DICTIONARY 1271 (8th ed. 2004).

Section 550(b) of the Bankruptcy Code provides a "good faith" defense to any immediate or mediate transferee of the initial transferee under subsection (a)(2). To determine if the "good faith" defense should be applied by analogy to a transferee of a

claim, the Court will examine each prong of section 550(b) of the Bankruptcy Code to

determine whether the results warrant the relief sought by Bear.  The three elements for

the "good faith" defense under subsections of 550(b) of the Bankruptcy Code are (1)

good faith, (2) for value and (3) without knowledge of the voidability of the transfer.  11

U.S.C. § 550(b).

Courts have applied an objective standard for good faith of a transferee similar to

that applied under section 548(c) of the Bankruptcy Code.  *See* 5 Collier on Bankruptcy,

¶ 550.02, at 23-4.  Courts have found that the transferee does not act in good faith if the

transferee had knowledge of the debtor's unfavorable financial condition at the time of

transfer.  *Id.* (citation omitted).  Courts have further found "a transferee does not act in

good faith when he has sufficient knowledge to place him on inquiry notice of the

debtor's possible insolvency."  *Jobin v. McKay* (*In re M& L Bus. Mach. Co.*), 84 F.3d

1330, 1336 (10th Cir. 1996) (citing *Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d

1348, 1355 (8th Cir. 1995)).

Regarding the third prong under subsection (b)(1) – which concerns having no

knowledge of the voidability of the transfer, courts have found that a subsequent

transferee is not a good faith transferee, if he knew of a debtor's financial difficulties and

the likelihood of bankruptcy.  Further, such knowledge is sufficient to put such

subsequent transferee on notice.  *See Max Sugarman Funeral Home, Inc. v. A.D.B.*

*Investors*, 926 F.2d 1248, 1257 (1st Cir. 1991) (holding that the transferee was not a good

faith transferee because he knew of the chance of voidability due to the entity's

unmanageable indebtedness and the likelihood of bankruptcy).  *See also Kendall v.*

*Sorani, et al.* (*In re Richmond Produce Co.*), 195 B.R. 455, 464 (N.D. Cal. 1996)

45

(holding that a transferee is sufficiently put on notice if he knew of a debtor's financial difficulties and its recent buyout of debtor was highly leveraged).

Moreover, when one examines the elements of the defense, it does not protect a purchaser who either knows or should have known[19] of potential challenges to a transferor's right to the property at issue vis-á-vis a prior transferor.  Thus, the criteria for determining whether a transferee acted in good faith in the purchase of the claims does not solely rely upon such transferee's actual knowledge of whether the claims would be challenged by litigations arising from causes of action, such as equitable subordination. Instead, the premise established by case law under section 550(b) of the Bankruptcy Code is (1) the transferee's knowledge of the debtor's possible insolvency or unfavorable financial condition at the time of the transfer, or (2) notice that the transfer may be recovered by the trustee.

As stated previously, a claim-purchaser, by definition, knows that it is purchasing a claim against a debtor and is on notice that any defense or right of the debtor, including equitable subordination, may be asserted against that claim.  Further, as discussed previously, Bear knew or should have known the risks associated with the purchase of a debtor's distressed debt.[20]  In particular, Bear purchased the Claim on May 26, 2004 approximately eight months after Enron's commencement of the MegaComplaint Proceeding against several banks, including CSFB.  Bear knew or should have known, or

---

[19] Courts construe "knowledge" by examining ". . . what the transferee objectively 'knew or should have known' in questions of good faith, rather than examining what the transferee actually knew from a subjective standpoint." *Jobin*, 84 F.3d at 1336 (citations omitted).  Bankruptcy courts have also held that a transferee who reasonably should have known of a debtor's insolvency is not entitled to the "good faith" defense under section 548(c) of the Bankruptcy Code. *Id.* (citations omitted).

[20] *See* Supra, n. 13.

was on notice that Enron may assert any defense or right to challenge the Claim held by

CSFB, including among other things, its priority within a class (equitable subordination).

Moreover, the knowledge that a trustee or debtor in possession will examine a

claim is not speculative or hypothetical.  By contrast, in raising a section 550(b) defense,

a transferee would argue, among other things, that it had no knowledge of any alleged

wrongful conduct regarding the transaction as between the debtor and the transferor.  If

such transferee knew that a fiduciary was going to investigate the "voidability" of the

transaction, it would appear to the Court that such knowledge would be sufficient to

defeat the defense.  If a transferee were aware of the potential for an investigation, the

possibility of the voidability of the transfer would hardly be hypothetical or speculative.

Returning to consideration of a claim, while the knowledge that the obligation of a trustee

or debtor in possession to investigate matters related to claims against the estate does not

equate to specific knowledge of any wrongful conduct on the part of the transferor of a

claim as against the debtor, nevertheless, it is hardly speculative or hypothetical that such

wrongful conduct may be alleged following the investigation.

As discussed previously, the section 550(b) transferee lacks good faith in

circumstances where the transferee had knowledge of the debtor's unfavorable financial

condition or bankruptcy filing at the time of transfer, or information that an investigation

of the underlying transaction would take place.  Thus, the Court concludes that even if

section 550(b) of the Bankruptcy Code applied by analogy, a claim transferee could not

establish that it was merely speculative or hypothetic that an action might be commenced

regarding the transferred claim.  The transferee could not establish that it "took" without

knowledge or notice that an action might be brought against the claim. Therefore, such defense would have to fail.

In addition, under section 550(b) of the Bankruptcy Code, "the 'value' required to be paid by the transferee is merely consideration sufficient to support a simple contract . . . . There is no requirement that the value given by the transferee be a reasonable or fair equivalent." 5 Collier on Bankruptcy, ¶ 550.03, at 22 n. 1 (citations omitted). Implicit in the "value" requirement of section 550(b) of the Bankruptcy Code is that the value paid is determined without knowledge of the potential voidability of the transfer of the property. By contrast, in the claims-transfer market, the possibility of equitable subordination of a claim is not purely speculative or hypothetical. The value of a claim is set by the marketplace's view of the attendant risks, including equitable subordination, in the bankruptcy process. In a bankruptcy proceeding, the claim-purchaser must decide whether the value is justified based upon, among other things, the perceived risks of payment. Thus, the value paid for a claim in the marketplace has already taken into account the bankruptcy risks either by discount, indemnification or both. Consequently, immunizing a transferred claim from subordination would alter risk factors associated with the claim and would interfere the efficient market by artificially enhancing its value in the claims-transfer market.

Lastly, Congress made it clear under section 550(b) of the Bankruptcy Code, the transferee must be a good faith transferee to qualify for the exemption. *See* House Report No. 95-595, 95th Cong., 1st Sess. 375-76 (1977); Senate Report No. 95-989, 95th Cong., 2d Sess. 90 (1978), *see also* 5 Collier on Bankruptcy, ¶ 550.03, at 25, n.20. The "good faith" defense in subsections (b)(2) is designed to "prevent a transferee from whom the

48

trustee could recover from transferring the recoverable property to an innocent transferee, and receiving a retransfer from him, that is, 'washing' the transaction through an innocent third party." *Id.* at 23-24.  The Court has found that Bear cannot establish the three elements to qualify for the "good faith" defense.  As a result, the exemption would be contrary to congressional policy that prevents a prior transferor from "washing" the transaction through an innocent third party.

Therefore, there is no basis in law or equity to expand the "good faith" defense provisions of the Bankruptcy Code or common law to the claim-purchaser and to thereby exempt that purchaser from the relief sought by a trustee or debtor in possession based on equitable subordination.  Based upon the above analysis, even by analogy, the "good faith" defense under section 550(b) of the Bankruptcy Code is not applicable in the context of equitable subordination asserted by Bear herein.  Thus, the Court concludes that equitable subordination of the Claim is not inconsistent with the policy that affords a good faith purchaser protection under the Bankruptcy Code.  Further, the Court finds that equitable subordination of the Claim is not contrary to any policy underlying any provisions of the Bankruptcy Code.

## CONCLUSION

The Court rejects Bear's contention that the letter-of-credit claim, which was transferred by the original holder who is alleged to have engaged in certain inequitable conduct, cannot be subject to subordination under section 510(c) of the Bankruptcy Code in the hands of a transferee.  Instead, the Court concludes that (1) equitable subordination applies broadly to potentially reach any claim held by a claimant, limited only by the amount of damages stemming from the inequitable conduct that is not otherwise fully

compensated to the injured creditor class, (2) the transfer of a claim subject to equitable subordination does not free such claim from subordination in the hands of a transferee. Rather, a claim in the hands of a transferee, either as an initial transferee or a subsequent transferee, who received that claim from a transferor found to have engaged in inequitable conduct is subject to the same equitable relief against the claim, as if, such claim was still held by the transferor. The remedy of equitable subordination remains with the claim, and (3) the "good faith" defense, as asserted by Bear, is not available to a post-petition claim-purchaser.

Assuming as true all of the material allegations in Enron's Complaint, section 510(c) of the Bankruptcy Code, as a matter of law, would not immunize a transferee from subordination in connection with the alleged misconduct of CSFB. As Bear sought dismissal based upon the application of section 510(c) of the Bankruptcy Code, dismissal of the first cause of action is not warranted. Therefore, Bear's motion to dismiss on the first cause of action in this adversary proceeding is denied.

Counsel for the Debtors is to settle an order consistent with this Court's Opinion.

Dated: New York, New York
        November 28, 2005

                                **s/Arthur J. Gonzalez**
                                UNITED STATES BANKRUPTCY JUDGE